IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| REBEKAH MARKHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | Judge _____ |
| EASTMAN CHEMICAL COMPANY, | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

---

## COMPLAINT

---

COMES NOW the Plaintiff, REBEKAH MARKHAM, and hereby sues the Defendant, and for cause of action would show unto this Honorable Court as follows:

1.      Plaintiff, Rebekah Markham, is a citizen and resident of Washington County, Tennessee.

2.      Defendant, Eastman Chemical Company, is a for profit corporation with its principal address at 200 South Wilcox Drive, Kingsport, Sullivan County, Tennessee, and may be served with process through its Registered Agent, United Agent Group, Inc., 5865 Ridgeway Center Parkway, Ste 395, Memphis, TN 38120.

3.      Jurisdiction is founded upon Federal Question, 28 U.S.C. § 1331, the Equal Pay Act, 29 U.S.C. § 206, the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg-1, *et seq*., and the doctrine of Supplemental Jurisdiction, 28 U.S.C. § 1367.

1

4.  Venue is proper under the code provisions cited herein, and 28 U.S.C. § 1391(b) and (c).

5.  At all times stated herein, Defendant was and currently is an employer subject to the provisions of the Equal Pay Act of 1963, 29 U.S.C. § 206(d).

6.  At all times stated herein, Defendant was and currently is an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

7.  At all times stated herein, Defendant was and currently is an employer subject to the provisions of the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

8.  At all times stated herein, Defendant was and currently is an employer subject to the provisions of the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg-1, *et seq*.

9.  At all times stated herein, Defendant was and currently is an employer subject to the provisions of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq., the* Tennessee Equal Pay Act, Tenn. Code Ann. § 50-2-201, *et seq*., and the Tennessee Pregnant Worker's Fairness Act, Tenn. Code Ann. § 50-10-101, *et seq.*

10.  Defendant is an employer engaging in an industry affecting commerce and employs more than five hundred (500) regular employees.

11.  Employers, such as the Defendant, must train and supervise its managers to comply with anti-discrimination laws in order to protect employees in the workplace.

12.  Employers, such as the Defendant, must promptly and honestly investigate complaints of discrimination in the workplace.

13.  Employers, such as the Defendant, must eradicate discrimination and retaliation in the workplace.

2

14.     Employers, such as the Defendant, must train and supervise its managers to investigate and eradicate complaints of discrimination and retaliation in order to protect employees in the workplace.

15.     Employers, such as the Defendant, must never ignore discrimination in the workplace, nor retaliate against employees who complain of discrimination.

16.     Employers, such as the Defendant, must never protect employees who engage in discriminatory or retaliatory conduct toward other employees.

17.     The Plaintiff is female.

18.     Plaintiff was originally hired by Defendant in April of 2014 as an intern, and she was thereafter hired full time on October 6, 2014 as a Cost Accountant.

19.     During her employment, Plaintiff received the following promotions:

- Promotion to BT2 "Advanced Accountant" April 2017

- Promotion to BT3 with Project Manager role August 2021

- Promotion to BT4 with Team Lead Role February 2023

- Promotion to L2 as PEG Supervisor effective March 2024 (title was later changed to Process Excellence Manager in September of 2024).

20.     During her employment, Plaintiff earned multiple raises.

21.     After Plaintiff was hired, she received a merit raise every year of her employment except for the year 2019.

22.     During her employment, Plaintiff received numerous positive performance evaluations.

23.     During her employment, Plaintiff received many special awards due to performance on projects, including a $20,000 bonus on February 2, 2024.

24.     During her employment, Plaintiff also received numerous "VIP Awards" which are given by Defendant based on Defendant's profitability and to reward employee performance.

25.     During her performance, Plaintiff never received less than 100% of the VIP bonus.

26.     During her employment, Plaintiff was also nominated for an ERP Special Monetary Award in December of 2024 by Helen Wang that would have paid Plaintiff approximately $500.00, but this was not approved by Defendant in retaliation for her protected activities as hereinafter set forth.

27.     During her employment, Plaintiff always received satisfactory performance ratings or above.

28.     Plaintiff's annual evaluation for the year 2024, rated Plaintiff as "Meets Expectations" in both behavior and competency.

29.     During her employment, Plaintiff never received a needs improvement performance evaluation.

30.     During her employment, Plaintiff never received a written reprimand or written warning.

31.     During her employment, Plaintiff never received a verbal reprimand.

32.     During her employment, Plaintiff never received a verbal warning concerning her performance, or concerning any other matter.

33.     By way of background, while employed by Defendant, Plaintiff took maternity leave on or about February 26, 2018 to September 10, 2018 (hereinafter referred to as Plaintiff's "First Maternity Leave").

34.     The Plaintiff started reporting to Crystal Bennett, on September 10, 2018 after Plaintiff had returned from her First Maternity Leave.

4

35.   At all times stated herein, Crystal Bennett was an agent and employee of Defendant.

36.   In or around January, 2024, Plaintiff learned that she made less than a similarly-situated male employee in Plaintiff's department (Michelle Stewart's Controller Division) after he shared his salary with her. Although this male employee was paid more than Plaintiff, he was at a lower-level job grade than Plaintiff, and he had five years less experience than Plaintiff. This male employee informed Plaintiff he was paid $100,000.00 while at that same time, Plaintiff was paid $98,280.00. Plaintiff also learned that this male employee had also been given a $20,000.00 retention bonus in December of 2023.

37.   Plaintiff complained of this pay discrimination involving this male employee in good faith to the General Business Conduct ("GBC") investigator in connection with her GBC complaint as hereinafter alleged.

38.   In 2023, Plaintiff became pregnant a second time and would have taken her second maternity leave, but unfortunately, on January 9, 2024, Plaintiff suffered a miscarriage.

39.   Plaintiff informed her supervisor, Crystal Bennett of her miscarriage on or about January 10, 2024.

40.   In February of 2024, Plaintiff was informed by her supervisor, Crystal Bennett, that she was going to be promoted from Team Lead of Process Excellence to the position of Process Excellence Supervisor (a L2 leadership role), but the exact compensation amount had not been determined. Ms. Bennett suggested that Plaintiff speak to her supervisor, Randy Burton, about the compensation level for this position, and after receiving assurances that same day from Mr. Burton, Plaintiff accepted the promotion.

41.   The Plaintiff's promotion was announced the very next day.

42.   At all times stated herein, Randy Burton was an agent and employee of Defendant.

43.     When Plaintiff was first informed of her promotion in February 2024, the Plaintiff was leery about accepting this new position with increased responsibilities without knowing the salary because for a number of years Plaintiff had raised concerns about her salary, because it seemed to be lagging behind the salaries of her peers.

44.     Plaintiff had discussed her concerns about her salary several times with her supervisor, Crystal Bennett, going back to approximately 2021, including during her mid-year and annual reviews.   The Plaintiff had requested that she be provided certain information about her salary, including the "salary range" for her positions, but her supervisor, Crystal Bennett, generally dismissed her requests. However, Ms. Bennett did inform Plaintiff that her salary was somewhere near the middle of the salary range after Plaintiff asked where she fell in the range, but Plaintiff later found out this statement was not true.

45.     When Plaintiff spoke to Randy Burton in February of 2024, she inquired about the salary range for the Process Excellence Supervisor position and explained that she had previously requested information regarding her compensation in her former positions from Crystal Bennett, but she did not receive it.

46.     In response, Randy Burton stated that he was unaware that Plaintiff had requested information regarding her compensation, and he stated he would look into it.

47.     Later, after reviewing it further, Randy Burton told Plaintiff he agreed that Plaintiff's compensation in her current role was substantially lower than it should have been, and was in the bottom or below the bottom of the salary range for her position.

48.     Randy Burton explained to Plaintiff that her pay was lower than it should be now and the pay discrepancy went all the way back to 2019, and when he asked Crystal Bennett what happened in 2019, Bennett told him that Plaintiff had taken maternity leave around this time.

6

49.     Plaintiff learned later that she did not receive an approved merit raise for 2018 that would have gone into effect on April 1, 2019. (A copy of Plaintiff's 2019 Compensation Action Summary is attached as Exhibit 1).

50.     Plaintiff had taken maternity leave from on or about February 26, 2018 to September 10, 2018 as allowed by Federal and State law, and as also allowed by Defendant's policies.

51.     The Plaintiff told Randy Burton that the reference to her pay being negatively impacted in 2019 due to her maternity leave was very upsetting to her, and she felt that punishing her for taking maternity leave was not right.

52.     Randy Burton originally had indicated to Plaintiff that a retention bonus could be used to bridge the gap in Plaintiff's compensation. However, after Randy Burton discussed giving Plaintiff a retention bonus as a means to make up the inequity in her compensation with Michelle Stewart, VP Controller and Accounting, Ms. Stewart said "no" to this proposal. However, Ms. Stewart had previously approved a retention bonus of $20,000 in December of 2023 to a similarly situated male employee.

53.     Thereafter, Randy Burton stated Plaintiff would receive a raise when her promotion Process Excellence Supervisor became effective, and her pay would be revisited in six (6) months and this would be more beneficial to her.

54.     However, Plaintiff's pay was not revisited six (6) months later.

55.     Plaintiff's pay raise for the promotion to Process Excellence Supervisor became effective on or about April 12, 2024.

56.     A similarly situated employee, Brittany Salyer, who was hired in April of 2014 and who also reported to Crystal Bennett, went on maternity leave in or about September 2023. Ms.

Salyer told Plaintiff that Crystal Bennett had reached out to her several times while she was on maternity leave, inquiring about her return date from maternity leave. Before Ms. Salyer had provided Crystal Bennett with a date for her return to work, Crystal Bennett sent out an email announcing her return-to-work date to other employees, indicating that Ms. Salyer would be returning in or about January, 2024.

57. At the time Crystal Bennett sent out the email, Ms. Salyer had not yet decided on her return date, and she had additional FMLA time available. Due to Ms. Salyer's return date being sent out to employees by Crystal Bennett combined with the fact that Crystal Bennett had reached out to her several times during her maternity leave asking when she would be returning to work, Ms. Salyer felt pressured to return on the date Crystal Bennett had announced. Thereafter, Ms. Salyer returned from her maternity leave early in January 2024, and she was terminated shortly thereafter on February 15, 2024, as part of an alleged headcount reduction.

58. At the time of her termination, Ms. Salyer's job title was Accountant and she reported to Crytal Bennett.

59. At the time of the termination of Ms. Salyer in February 2024, there was another female Accountant in Crystal Bennett's department that had a recent poor performance review, but she had not taken maternity leave within the past ten (10) years, and she was not selected for termination. However, Ms. Salyer had not had a poor evaluation, yet she was selected for termination nevertheless.

60. Crystal Bennett was involved in the decision to terminate Ms. Salyer.

61. The discriminatory treatment of Ms. Salyer as referenced above is relevant in part because it shows Crystal Bennett's bias and discriminatory actions, and also because Plaintiff engaged in protected conduct when she complained of the discriminatory treatment of Ms. Salyer

in connection with Plaintiff's Global Business Conduct ("GBC") complaint as hereinafter mentioned.

62.     While Randy Burton was continuing to review Plaintiff's pay inequity situation, Plaintiff began to face retaliation and hostile treatment from her supervisor, Crystal Bennett, who was aware that Plaintiff had been speaking to Randy Burton regarding her pay inequity, including that Plaintiff was punished in 2019 with respect to her pay because Plaintiff had taken maternity leave in 2018. The retaliation Plaintiff experienced included Crystal Bennett beginning to track Plaintiff's sick days in March, 2024, something that Crystal Bennett had not done previously.

63.     After Plaintiff suffered a miscarriage on January 9, 2024, Plaintiff thereafter suffered from serious medical complications relating to her miscarriage that eventually resulted in Plaintiff's doctor advising Plaintiff to take medical leave.

64.     On March 8, 2024, the Plaintiff informed Randy Burton of her serious medical condition relating to her pregnancy and subsequent miscarriage.

65.     On March 8, 2024, the Plaintiff informed Randy Burton of her need for medical leave (FMLA leave) so she could recover from her serious medical condition, related to her pregnancy and subsequent miscarriage.

66.     On March 8, 2024, the Plaintiff informed Crystal Bennett of her need for medical leave (FMLA leave) so she could recover from the serious medical condition, related to her pregnancy and subsequent miscarriage.

67.     Plaintiff was concerned that she would be retaliated against for taking FMLA leave due to the complications from her pregnancy and subsequent miscarriage because she recently learned that she had been punished with respect to her pay in 2019 as a result of her maternity leave in 2018, and she was aware of the discriminatory treatment of Brittany Salyer related to her

pregnancy and maternity leave.

68.     Plaintiff's doctor determined on or about March 8, 2024, that Plaintiff's medical leave should be backdated so that it began on March 6, 2024, and the Plaintiff thereafter, requested and was approved, for FMLA leave beginning March 6, 2024.

69.     Thereafter, Plaintiff notified Defendant she would return from FMLA leave on May 14, 2024.

70.     Requesting medical leave related to pregnancy or complications of pregnancy constitutes a request for reasonable accommodations.

71.     At the time Plaintiff went on FMLA leave, Plaintiff's direct supervisor was the Process Excellence and Accounts Payable Manager, Crystal Bennett. However, on or about April 23, 2024, while on FMLA leave, Plaintiff learned that when Plaintiff returned from FMLA leave, she would begin reporting to the SEC Reporting and Process Excellence Manager, Jessica Moss.

72.     On April 29, 2024, Plaintiff submitted a complaint to Defendant's GBC office, which is an internal department that receives and investigates complaints and concerns submitted by employees.   (A copy of Plaintiff's GBC complaint is attached hereto as Exhibit 2).

73.     The Plaintiff submitted this complaint to GBC in good faith because she wanted Defendant to properly investigate and review her complaint that she and Ms. Salyer had been discriminated against in connection with their pregnancies and their respective maternity leaves, and Plaintiff had otherwise been discriminated against in connection with her pay. Plaintiff was further concerned that she would face retaliation for the complaints that she had already raised, and/or would face additional retaliation for having to take FMLA leave related to her pregnancy and subsequent miscarriage.

74.     Plaintiff's conduct in making a discrimination complaint concerning herself and

Ms. Salyer in good faith constitutes a protected activity.

75.     However, Defendant never investigated Plaintiff's complaint that Ms. Salyer had been discriminated against due to her pregnancy and/or due to her maternity leave.

76.     At the time Plaintiff made the discrimination complaint, Defendant had a policy where it supposedly encouraged its employees to "speak up" and report the types of complaints and concerns listed in Plaintiff's GBC complaint without fear of retaliation.

77.     In Plaintiff's complaint to GBC, she provided a narrative of the events, and she further stated: "I feel concerned that there is a potential bias occurring with employees taking maternity or reproductive-related leave that is impacting pay and treatment by this manager [referring to Crystal Bennett] at work." (See Exh. 2).

78.     After Plaintiff's GBC complaint was submitted on April 29, 2024, Defendant assigned Steve Hammonds to investigate the complaint.

79.     At all times stated herein, Steve Hammonds was an agent and employee of Defendant.

80.     After filing the GBC complaint, Plaintiff spoke to Steve Hammonds on several occasions concerning her GBC complaint, and she also sent him several emails providing additional details. (True and exact copies of Plaintiff's emails to Steve Hammonds are attached hereto as Exhibit 3).

81.     In her GBC complaint, Plaintiff specifically referenced the other employee discriminated against for going on maternity leave, and the employee's subsequent termination. (See Exhs. 2 and 3).

82.     Plaintiff's GBC complaint implicated multiple high-level employees that were involved as her supervisor or in her reporting line that oversaw her position, including her previous

boss, Process Excellence and Accounts Payable Manager, Crystal Bennett, Director of Accounting, Deanna Griffith, and Griffith's boss, VP, Controller and Accounting, Michelle Stewart.

83.     Deanna Griffith was the Director in Plaintiff's reporting line from 2019-2021 during the pay inequity years as well, including in 2019, when Plaintiff was not awarded a merit raise due to having taken maternity leave, and a report of discrimination could be perceived as reflecting on her leadership.

84.     At all times stated herein, Deanna Griffith was an agent and employee of Defendant.

85.     During the years of Plaintiff's pay inequity, 2019-2025, VP, Controller and Accounting, Michelle Stewart was in Plaintiff's reporting line, and Michelle Stewart ultimately had authority over the division budget.

86.     At all times stated herein, Michelle Stewart was an agent and employee of Defendant.

87.     Additionally, Plaintiff's GBC complaint noted that Randy Burton originally had indicated that a retention bonus could be used to bridge the gap in Plaintiff's compensation. (See Exh. 2). However, after Mr. Burton discussed the retention bonus concept in early 2024 with Michelle Stewart, Ms. Stewart said "no" to this proposal.

88.     However, Michelle Stewart had approved a $20,000.00 retention bonus for a similarly situated male employee, in or around December 2023 that was to be paid over two years in addition to his salary, that was already higher than Plaintiff's salary, despite the fact that he was at a lower-level position.

89.     Plaintiff made Steve Hammonds aware of a potential retaliation event in May of

2024 after Crystal Bennett had abruptly removed Plaintiff from a project even though the concept for the project had been Plaintiff's original idea. (See Exhibit 3).

90.    On July 25, 2024, Plaintiff was informed by Steve Hammonds that the GBC investigation found that Plaintiff's GBC complaint was "substantiated/partially substantiated."

91.    During the investigation, Plaintiff was informed by Steve Hammonds that the investigation revealed that Plaintiff received no merit raise in 2019 despite the fact that a 3.08% merit raise for 2018 had been approved as stated in the attached Compensation Action Summary. The 3.08% merit raise should have been given to Plaintiff on April 1, 2019. (A true and exact copy of the Compensation Action Summary approving the merit raise is attached hereto as Exhibit 1).

92.    Plaintiff had been approved for a merit raise for 2018 of 3.8% that should have taken effect on April 1, 2019, but this merit raise was not given to Plaintiff.    (Exh. 1).

93.    Crystal Bennett made the decision not to give Plaintiff the approved merit raise for 2018.

94.    Withholding a merit raise due to an employee going on maternity leave would violate Defendant's policies prohibiting discrimination.

95.    Plaintiff further learned during the investigation that she did not receive an appropriate raise after receiving a promotion to Project Manager on September 3, 2021, but the raise was delayed for approximately six (6) months, and was not effective until February 18, 2022. Plaintiff also learned that her bonus percentage was inputted at 8% for this specific promotion in 2021, when the bonus percentage for that position was actually supposed to be 12%.

96.    Steve Hammonds informed Plaintiff that his findings would likely result in disciplinary action for Crystal Bennett, and he stated that Plaintiff would be protected from retaliation of any kind.

13

97.     As a result of the GBC investigation and findings, GBC made recommendations for Defendant to correct these issues, including appropriate discipline/counseling of Crystal Bennett.

98.     Plaintiff was informed by Steve Hammonds that the findings were being submitted to Defendant's Human Resources Department so action could be taken, but Plaintiff was not permitted to review the GBC final report.

99.     Crystal Bennett was never disciplined for discriminating against Plaintiff or Ms. Salyer.

100.    On August 20, 2024, Plaintiff met with HR employees, Christa Aranda and Jennifer Whitson wherein Plaintiff was offered: $5,439.18, which Defendant contended would correct the pay equities, and at this time Plaintiff was provided a "General Release" she was supposed to sign. (A true and exact copy of Plaintiff's General Release is attached hereto as Exhibit 4).

101.    At all times stated herein, Christa Aranda was an agent and employee of Defendant.

102.    At all times stated herein, Jennifer Whitson was an agent and employee of Defendant.

103.    The Defendant's intent in requiring Plaintiff to sign the General Release (Exh. 4) was for Plaintiff to release all of her claims and potential claims against the Defendant, including her claims and potential claims of discrimination and retaliation.

104.    Defendant conditioned Plaintiff's receipt of the backpay upon Plaintiff first signing the "General Release." (Exh. 4).

105.    The General Release was to be signed by Michelle Stewart on behalf of the Defendant. (Exh. 4).

106.    The Plaintiff questioned the General Release because it recited alleged facts that

14

were not accurate, and the amount reflected therein did not correct the pay inequity, and it did not address Plaintiff's concerns of retaliation.

107.    The Plaintiff thereafter reached out to Steve Hammonds, the GBC investigator, to discuss the August 20, 2024, meeting with HR and the General Release, that Plaintiff was provided.

108.    Thereafter, Steve Hammonds sent Christa Aranda an email on August 23, 2024 and blind copied Plaintiff with the subject: "Clarification". (A true and exact copy of the August 23, 2024 email is attached hereto as Exhibit 5).

109.    In part, Mr. Hammonds' email clarified that Plaintiff's GBC complaint "had little to do with the actual compensation but instead it was more about the perceived wrongdoing of her manager Crystal Bennett regarding her maternity leave issue." (Exh. 5).

110.    Mr. Hammonds also stated in the email that Plaintiff may ask HR to consider changing some of the language "in your settlement letter" (referencing the General Release). (Exh. 5).

111.    On August 26, 2024, Plaintiff sent an email to Christa Aranda and Jennifer Whitson expressing her concern that she would receive further retaliation for "having another Family Leave due to my miscarriage", and that she had reported a possible retaliation event to GBC in late May after she returned from medical leave when Crystal Bennett had abruptly replaced her on a project, the concept for which had been Plaintiff's idea. (A true and exact copy of the August 26, 2024 email is attached hereto as Exhibit 6).

112.    Thereafter, Plaintiff had several meetings in August and September 2024 with Human Resource employees, Jennifer Whitson and Christa Aranda, to discuss the pay inequity, proposed solutions, and the issues involving the General Release.

15

113.    During one of these meetings, Defendant provided Plaintiff with a second General Release, offering $7,974.56. (A true and exact copy of the Second General Release attached hereto as Exhibit 7).

114.    Defendant thereafter provided a third revised General Release, on or about August 29, 2024, offering $10,000.00. (A true and exact copy of the Third General Release is attached hereto as Exhibit 8).

115.    Both the second and third General Releases were also to be signed by Michelle Stewart on behalf of the Defendant. (See Exhs. 7 and 8).

116.    During a conversation with Human Resources Manager, Jennifer Whitson, on or about August 29, 2024, Whitson told Plaintiff if she was not happy with the amount of back pay or with being required to sign a General Release, Ms. Whitson would look into a "separation package" for her.

117.    Plaintiff was not looking to leave Defendant and she felt Jennifer Whitson's remark was a threat, as well as improper pressure to induce Plaintiff to sign the General Release.

118.    Plaintiff did not agree with signing the General Release because it recited facts that were not accurate, and the amount of back pay did not make her whole.

119.    Although the Plaintiff was pressured to sign the third General Release (see Exhibit 8), on September 6, 2024, Plaintiff refused to sign the General Release.

120.    As a result of her refusal to sign the General Release, the Plaintiff did not receive any backpay.

121.    Thereafter, Defendant's management employees, including Crystal Bennett and Michelle Stewart, began targeting Plaintiff and retaliating against Plaintiff for raising her concerns of discrimination and retaliation, including retaliation for refusing to release her federally protected

16

rights.

122.    Specifically, Defendant's leadership, including Crystal Bennett and Michelle Stewart, became more hostile towards Plaintiff, and Plaintiff began noticing that upper management in her department appeared to be intentionally excluding her from communications, degrading her to other employees, removing her from significant projects, taking away other responsibilities from her, and taking other actions to make her job more difficult or unpleasant, including not responding to emails.

123.    Plaintiff attempted to address these retaliatory actions unsuccessfully, but she wanted to keep her job, and she was concerned that she was being set up for termination.

124.    Eventually, on February 18, 2025, Plaintiff sent an email to Human Resources Partner, Christa Aranda, to complain and express her concerns that she was being retaliated against.   (A true and exact copy of the February 18, 2025 email is attached hereto as Exhibit 9).

125.    The Plaintiff's goal in contacting HR about the retaliation, was to seek guidance on how to navigate her concerns of retaliation without involving GBC because Plaintiff wanted to keep her job.

126.    In response, on February 19, 2025, Ms. Aranda informed Plaintiff that she could make another GBC complaint if she believed she was being retaliated against.

127.    Retaliating against an employee for making discrimination complaints would be illegal, and would also violate Defendant's policies.

128.    Retaliating against an employee for making a complaint they had been retaliated against for making discrimination complaints would be illegal and would also violate Defendant's policies.

129.    On March 4, 2025, a few days after making her retaliation complaint, Plaintiff was

17

abruptly terminated in a meeting with Human Resources Partner, Christa Aranda, and Assistant Controller, Kevin Garry.

130.     During the termination meeting on March 4, 2025, Plaintiff was told they wanted to revisit Plaintiff's recent claims of retaliation, and that both GBC and HR had spent considerable time in the last year working through her concerns as well as recommendations, but Plaintiff had expressed distrust and she perceived actions to be retaliatory, and they had made the decision to terminate her.

131.     Plaintiff's complaints of discrimination were made in good faith.

132.     Plaintiff's complaints of retaliation were made in good faith.

133.     At the time of Plaintiff's termination, she was given a Separation Notice that stated: Termination – Other; Involuntary Separation. (A true and exact copy of the Separation Notice is attached hereto as Exhibit 10).

134.     At the time of her termination, Plaintiff's job title was Process Excellence Manager in the Accounting Department.

135.     Plaintiff was qualified for the position of Process Excellence Manager.

136.     At the time of her termination, as hereinafter alleged, Plaintiff reported to Jessica Moss, Manager of SEC Reporting Process Excellence.

137.     Plaintiff began reporting to Jessica Moss in or around late April 2024.

138.     At all times stated herein, Jessica Moss was an agent and employee of Defendant.

139.     Kevin Garry made or was involved in the decision to terminate Plaintiff.

140.     Christa Aranda made or was involved in the decision to terminate Plaintiff.

141.     Jessica Moss made or was involved in the decision to terminate Plaintiff.

142.     Crystal Bennett made or was involved in the decision to terminate Plaintiff.

143.    Michelle Stewart made or was involved in the decision to terminate Plaintiff.

144.    Prior to Plaintiff's termination, Christa Aranda was aware that Plaintiff's GBC complaint included Plaintiff's belief that her manager (Crystal Bennett) used her maternity leave status as the reason to withhold her merit raise for 2018, and had also complained about the discrimination against Brittany Salyer.

145.    Prior to Plaintiff's termination, Kevin Garry aware that Plaintiff had complained her maternity leave was used as a reason to deny her merit raise for 2018, and had also complained about the discrimination against Brittany Salyer.

146.    Prior to Plaintiff's termination, Jessica Moss was aware that Plaintiff had complained her maternity leave was used as a reason to deny her merit raise for 2018, and that Crystal Bennett had also pressured a female employee (Brittany Salyer) to return early from maternity leave, and had also complained about the discrimination against Brittany Salyer.

147.    Prior to Plaintiff's termination, Crystal Bennett was aware that Plaintiff had complained her maternity leave was used as a reason to deny her merit raise for 2018, and had also complained about the discrimination against Brittany Salyer.

148.    Prior to Plaintiff's termination, Michelle Stewart was aware that Plaintiff had complained her maternity leave was used as a reason to deny her merit raise for 2018, and had also complained about the discrimination against Brittany Salyer.

149.    Prior to Plaintiff's termination, Christa Aranda was aware that Plaintiff had refused to sign the General Releases that were presented to Plaintiff.

150.    Prior to Plaintiff's termination, Kevin Garry was aware that Plaintiff had refused to sign the General Releases that were presented to Plaintiff.

151.     Prior to Plaintiff's termination, Jessica Moss was aware that Plaintiff had refused to sign the General Releases that were presented to Plaintiff.

152.     Prior to Plaintiff's termination, Crystal Bennett was aware that Plaintiff had refused to sign the General Releases that were presented to Plaintiff.

153.     Prior to Plaintiff's termination, Michelle Stewart was aware that Plaintiff had refused to sign the General Releases that were presented to Plaintiff.

154.     Employers must not condition continued employment on signing General Releases releasing federally protected rights.

155.     Prior to Plaintiff's termination, Christa Aranda was aware Plaintiff complained of retaliation.

156.     Prior to Plaintiff's termination, Christa Aranda was aware Plaintiff complained of discrimination.

157.     Prior to Plaintiff's termination, Jessica Moss was aware Plaintiff complained of retaliation.

158.     Prior to Plaintiff's termination, Jessica Moss was aware Plaintiff complained of discrimination.

159.     Prior to Plaintiff's termination, Crystal Bennett was aware Plaintiff complained of retaliation.

160.     Prior to Plaintiff's termination, Crystal Bennett was aware Plaintiff complained of discrimination.

161.     Prior to Plaintiff's termination, Michelle Stewart was aware Plaintiff complained of retaliation.

162.    Prior to Plaintiff's termination, Michelle Stewart was aware Plaintiff complained of discrimination.

163.    Prior to Plaintiff's termination, Kevin Garry was aware Plaintiff complained of retaliation.

164.    Prior to Plaintiff's termination, Kevin Garry was aware Plaintiff complained of discrimination.

165.    On information and belief, Plaintiff is not eligible for rehire by Defendant.

166.    At the time of her termination, Plaintiff was also given a "Separation Agreement: Release and Waiver". (A true and exact copy of the Separation Agreement: Release and Waiver is attached hereto as Exhibit 11).

167.    Plaintiff did not sign the Separation Agreement: Release and Waiver. (Exh. 11).

168.    In addition to herself, Plaintiff is aware of at least one other female employee that was in a leadership position with Defendant that suffered retaliation after making GBC complaints in 2024. For example, Kristi Bennett was abruptly terminated in November of 2024 by Christa Aranda after Ms. Bennett made a complaint to GBC about an employee making gender and race discriminatory remarks.

169.    The reason given for Plaintiff's termination was trumped up.

170.    The Defendant is responsible and liable for the discriminatory and retaliatory actions of its agents and employees under the doctrine of respondent superior and under agency principles.

171.    Following her termination, the Plaintiff filed a timely Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on or about April 28, 2025.   (A true and exact of Plaintiff's EEOC Charge is attached hereto as Exhibit 12).

172. The Plaintiff's EEOC Charge (Exhibit 12), was timely filed.

173. The Plaintiff received a Notice of Right to Sue from the EEOC, dated August 27, 2025. (A true and exact copy of the Notice of Right to Sue is attached hereto as Exhibit 13).

174. This Complaint was filed within ninety (90) days from the receipt of the Notice of Right to Sue (Exh. 13).

175. The Plaintiff alleges that Defendant, through its agents and employees, discriminated against her due to her sex, paid her less than similarly-situated males due to her sex, fired her due to her sex, and/or fired her in retaliation for engaging in protected activities.

176. Plaintiff was discriminated against because of her sex and/or retaliated against because she complained of discrimination and retaliation, and/or because she asked for a reasonable accommodation and/or took FMLA leave, in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the Equal Pay Act of 1963, 29 U.S.C. § 206(d), the FMLA Act, 29 U.S.C. § 2601, *et seq*., the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg-1, *et seq*., and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*, the Tennessee Pregnant Worker's Fairness Act, Tenn. Code Ann. § 50-10-101, *et seq.,* and the Tennessee Equal Pay Act, Tenn. Code Ann. § 50-2-201, *et seq*.

177. As a result of Defendant's conduct, the Plaintiff has lost tangible job benefits, including a loss of income and benefits, both past and future, including front pay, and has suffered and will continue to suffer irreparable injury, emotional distress, humiliation and embarrassment, and other pecuniary losses as a direct result of Defendant's illegal actions.

178. The conduct of Defendant is with malice or in reckless disregard to Plaintiff's federally protected rights sufficient to justify an award of punitive damages.

179. The conduct of Defendant is sufficient to justify an award of liquidated damages.

180.    Following her termination, Plaintiff's attorneys served a Notice of Non-Spoliation on the Defendant, dated April 29, 2025. (A true and exact copy of the Notice of Non-Spoliation is attached hereto as Exhibit 14).

138.    The Defendant received the Notice of Non-Spoliation, dated April 29, 2025, that was sent on behalf of the Plaintiff (Exh.14).

WHEREFORE, Plaintiff prays for the following relief:

1.    Compensatory damages, including front pay, (or in the alternative reinstatement if the Court deems it appropriate).

2.    Punitive damages.

3.    Liquidated damages.

4.    Prejudgment interest.

5.    Reasonable attorney's fees.

6.    The costs of this action.

7.    A jury to try this cause.

8.    Appropriate injunctive relief.

RESPECTFULLY SUBMITTED this 7th day of November, 2025.

**THE BURKHALTER LAW FIRM, P.C.**


s/David A. Burkhalter, II
David A. Burkhalter, II, BPR #004771
D. Alexander Burkhalter, III, BPR #033642
Zachary J. Burkhalter, BPR #035956
Attorneys for Plaintiff
111 S. Central Street
P.O. Box 2777
Knoxville, Tennessee 37901-2777
(865) 524-4974

23